419 F.2d 1265
 TEX TAN WELHAUSEN COMPANY and Tex Tan Western Leather Company, Division of Tandy Corporation, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TEX TAN WELHAUSEN COMPANY and Tex Tan Western Leather Company, Division of Tandy Corporation, Respondents.
 No. 26338.
 United States Court of Appeals Fifth Circuit.
 November 21, 1969.
 Rehearing Denied and Rehearing En Banc Denied January 12, 1970.
 
 Theo F. Weiss, Clemens, Knight, Weiss & Spencer, San Antonio, Tex., for petitioners.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Clifford Potter, Director, Region 23, N. L. R. B., Houston, Tex., Joseph A. Yablonski, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, William Wachter, Attorney, N. L. R. B., for respondents.
 Fred O. Weldon, Jr., Dallas, Tex., Mullinax, Wells, Mauzy & Collins, Dallas, Tex., for intervenor.
 Before BELL and GOLDBERG, Circuit Judges, and ATKINS, District Judge.
 GOLDBERG, Circuit Judge:
 
 
 1
 We here review a struggle of seemingly epic proportions enshrined for posterity in a record of more than 3,000 pages. In this labor case the Companies, Tex Tan Welhausen and Tex Tan Western Leather, hereafter referred to as Tex Tan, challenge an order of the National Labor Relations Board, and the Board cross petitions for enforcement of its order. This case arises out of contract negotiations entered into between Tex Tan and the Amalgamated Meatcutters and Butcher Workmen of North America, AFL-CIO, hereafter referred to as the Union. In March 1965, two months before its old contract expired, the Union notified Tex Tan that it wished to negotiate a new contract, and on April 5, 1965, the negotiations began. After months of conferences, the Union called a strike on November 8, 1965, claiming that Tex Tan was not bargaining in good faith. The Union simultaneously filed an unfair labor practice charge with the Board. During the strike and until the time of the hearing the negotiations continued but without success. In the meantime the strike terminated, and more unfair labor practices charges were filed when Tex Tan did not reinstate all strikers to their pre-strike jobs.
 
 
 2
 The National Labor Relations Board, adopting the findings of the Trial Examiner, found: (1) that Tex Tan had refused to bargain about piecework standards and piecework grievance procedures, and (2) that Tex Tan's overall approach to bargaining was not in good faith in violation of § 8(a) (5), 29 U.S. C.A. § 158(a) (5). As examples of Tex Tan's overall bad faith the Trial Examiner mentioned: a) Tex Tan's threat to move its plant to Puerto Rico; b) Tex Tan's refusal to discuss a wage increase until it obtained the seniority, grievance, arbitration, and piecework clauses it wanted; c) Tex Tan's refusal to incorporate into the contract matters which it claimed were its actual practice, including the Union's right to timestudy a job, the Union's right to file grievances on the establishment of standards, and a prohibition against retiming a job for high earnings; d) its issuance of a new rule book without notice to the Union; e) Tex Tan's avoidance of issues at the bargaining table and its avoidance of any tentative decision on these issues; f) Tex Tan's use of negotiators who had no authority to bargain; g) Tex Tan's frustration of the Union's attempts to make proposals acceptable; h) Tex Tan's use of unreasonable arguments in order to avoid reaching any agreement on arbitration, overtime, ventilation, and incorporation in the contract of the Company's own language regarding the retiming of job standards; and i) Tex Tan's refusal to give the Union's time-study engineer sufficient information to timestudy existing jobs.
 
 
 3
 The Board also accepted the Trial Examiner's finding (3) that the strike was caused and prolonged by the Company's refusal to bargain in good faith and was, therefore, an unfair labor practice strike. On the basis of finding #3 the Board found (4) that Tex Tan's failure to reinstate employees to their pre-strike jobs was a § 8(a) (3), 29 U.S. C.A. § 158(a) (3) violation and that the issuance of warning slips for low production to employees rehired for unfamiliar jobs was a § 8(a) (1), 29 U.S. C.A. § 158(a) (1) violation. The Board further found (5) that the denial of vacation pay to the strikers on the basis of their absence while striking was discriminatory and coerced the employees in the exercise of their rights in violation of § 8(a) (1) of the Act.
 
 
 4
 Pursuant to these findings the Board ordered that the Company cease and desist from these unfair labor practices and ordered Tex Tan to take certain affirmative action in expiation of its mis-adventures.
 
 
 5
 Tex Tan challenges the findings and the order of the Board on four grounds. First, it claims that the findings are not supported by substantial evidence. Second, Tex Tan contends that it was denied a fair hearing because some of the findings concern matters not alleged in the complaint and were therefore outside the legitimate scope of the Board's inquiry. Third, the Company contends that the order, even if based on proper findings, went beyond the remedial measures authorized in the National Labor Relations Act. Finally, Tex Tan argues that it was denied a fair hearing because of the bias and prejudice of the Trial Examiner. Finding no merit in these contentions we enforce the Board's order.
 
 I.
 
 6
 This court's function regarding Tex Tan's first complaint is clearly circumscribed by the substantial evidence rule. To be bromidic, if substantial evidence exists in the record as a whole to support the findings of the Board, its determination must be sustained by this court. Universal Camera Corp. v. NLRB, 1950, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456; NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829; NLRB v. Mayes Bros. Inc., 5 Cir. 1967, 383 F.2d 242; NLRB v. McGahey, 5 Cir. 1956, 233 F.2d 406; NLRB v. Poultry Enterprises, Inc., 5 Cir. 1953, 207 F.2d 522. We see no point in elaborating on the detailed evidence concerning the various examples of Tex Tan's misbehavior which is contained in this mammoth record. Suffice it to say that there is ample evidence in the record to sustain the Trial Examiner's finding that Tex Tan did refuse to bargain in good faith regarding the piecework standards and grievances, and that its overall approach to bargaining was not indicative of a good faith attempt to reach contract terms.
 
 
 7
 The Company asserts in its defense that there was no refusal to bargain and that the Trial Examiner found it guilty because he did not like the manner in which it bargained, the order in which subjects were discussed, its failure to make concessions, and its overall bargaining strategy. The evidence, however, does not support these contentions. The Trial Examiner noted that he did not intend by the enumerations of the examples of Tex Tan's behavior to "indicate that each such action or nonaction by itself, would in all circumstances show bad faith." Rather, he noted that "an overall appraisal of Tex Tan's bargaining compels the conclusion that it did not approach the negotiations `with an open mind and purpose to reach an agreement consistent with the respective rights of the parties.'" The record unquestionably supports the Trial Examiner's conclusion. It is true as the Company asserts that it continued to conduct many prolonged negotiating sessions. It is also true that the employer's mere refusal to concede during contract negotiations is not in itself a refusal to bargain. NLRB v. American National Insurance Co., 1952, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; Division 1142 Amalgamated Association of Street Electric Railway and Motor Coach Employees of America, AFL-CIO v. NLRB, 1961, 111 U.S.App.D.C. 68, 294 F.2d 264; White v. NLRB, 5 Cir. 1958, 255 F.2d 564; 29 U.S.C.A. § 158(d). However, the record demonstrates that during these sessions Tex Tan was really engaged in what this court has termed mere "shadow boxing to a draw," Stonewall Cotton Mills, Inc. v. NLRB, 5 Cir. 1942, 129 F.2d 629, 631, cert. denied, 317 U.S. 667, 63 S.Ct. 72, 87 L.Ed. 536. In fact we detect an air of filibustering from the inception of negotiations through the administrative moils. Obduracy and obstinacy may be weapons of bargaining, but where they are used not in the interest of bargaining but in its frustration, we cannot give them sanction or refuge. Procrastination and negativity are not components of negotiation. A. H. Belo Corp. v. NLRB, 5 Cir. 1969, 411 F.2d 959; NLRB v. Reed & Prince Mfg. Co., 1 Cir. 1953, 205 F.2d 131. The Act requires more than pretense. "There is a duty on both sides, though difficult of legal enforcement, to enter into discussions with an open and fair mind, and a sincere purpose to find a basis of agreement." Globe Cotton Mills v. NLRB, 5 Cir. 1939, 103 F.2d 91, 94. Accord, NLRB v. Herman Sausage Co., 5 Cir. 1960, 275 F.2d 229. While the Act does not require bargaining table surrender, it does require good faith discussions. Tex Tan breached this duty and was, therefore, guilty of an unfair labor practice. NLRB v. Mayes Bros., Inc., 5 Cir. 1967, 383 F.2d 242; NLRB v. Southwestern Porcelain Steel Corp., 10 Cir. 1963, 317 F.2d 527; NLRB v. Herman Sausage Co., supra; NLRB v. Denton, 5 Cir. 1954, 217 F.2d 567, cert. denied, 348 U.S. 981, 75 S.Ct. 572, 99 L.Ed. 764; Majure v. NLRB, 5 Cir. 1952, 198 F.2d 735.
 
 
 8
 Furthermore, there is substantial evidence in the record as a whole that it was Tex Tan's refusal to bargain in good faith which prompted the workers to go out on strike. Tex Tan asserts that this finding is based solely on the self-serving testimony of the Union negotiator and should not be accepted by this court. We reject this contention. The Trial Examiner and the Board chose to accept this testimony and, to be bromidic once again, it is clear that all questions as to credibility are to be resolved by the Board. As this court said in Independent, Inc. v. NLRB, 5 Cir. 1969, 406 F.2d 203:
 
 
 9
 "[I]t is a settled and by now a familiar principle that the decision of a trial examiner, affirmed by the Board is not open to attack merely on grounds of allegedly erroneous credibility determination. N.L.R.B. v. West Point Mfg. Co., 5 Cir. 1967, 245 F.2d 783; Martin Sprocket & Gear Company Inc. v. N.L.R.B., 5 Cir. 1964, 329 F.2d 417; Great Atlantic and Pacific Tea Company v. N.L.R.B., 5 Cir. 1966, 354 F.2d 707." 406 F.2d at 205.
 
 
 10
 Accord, Universal Camera Corp. v. NLRB, 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; NLRB v. Buddy Schoellkopf Products, Inc., 5 Cir. 1969, 410 F.2d 82; NLRB v. Camco, 5 Cir. 1965, 340 F.2d 803, cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339
 
 
 11
 We also reject Tex Tan's other evidentiary objections. The record as a whole contains substantial evidence to support the findings of the Trial Examiner as affirmed by the Board, and we see no justification to depart from these findings.
 
 
 12
 Having come to the conclusion that the evidence shows Tex Tan's unfair labor practices were the cause of the strike, we find that those parts of the Board's order relating to reinstatement and back pay for the strikers are valid. Mastro Plastics Corp. v. NLRB, 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; Majure v. NLRB, supra. Furthermore, that part of the order regarding low production slips for employees reemployed but placed on new jobs is also valid. An unfair labor practice striker is entitled to reinstatement to his old job. Hence no employee should be disciplined for low production when he is working at a new job after returning from an unfair labor practice strike. To so discipline him would penalize him for engaging in his protected right to strike.
 
 II.
 
 13
 Tex Tan's second objection is that the Trial Examiner deprived it of due process by making findings on matters not alleged in the complaint. In particular Tex Tan contends that the insistence on unilateral control of pay for pieceworkers, the refusal to bargain about pay rates, the overall approach to bargaining, and certain of the examples of overall bad faith were not alleged in the complaint. While it is true that these matters were not specifically alleged in these words in the complaint, we find Tex Tan's contention that it has been harmed by this omission without merit. To begin with, there was a specific allegation in the complaint that Tex Tan had negotiated in bad faith with no intent to enter a contract with the Union. This court has recently held that such an allegation brings into question "the general course of the Company's conduct as it reflected its attitude toward bargaining." NLRB v. Mayes Bros., Inc., 5 Cir. 1967, 383 F.2d 242, 247. Each of the Trial Examiner's specific findings to which Tex Tan objects was apposite to the issue of the Company's attitude toward bargaining and therefore under the Mayes Bros. rule was fairly comprehended in the language of the complaint. See also NLRB v. Southwestern Porcelain Steel Corp., 10 Cir. 1963, 317 F.2d 527.
 
 
 14
 Moreover, even if the specific examples of bad faith bargaining were not so included, the Company would still have little ground for complaint. All of these matters were fully discussed during the negotiations and no objection was made to the introduction of this evidence at the hearing. Both parties fully litigated the issue of good faith bargaining and assumed that these issues were relevant and proper subjects of inquiry. In such a situation the Company has not been prejudiced by the failure of the complaint to articulate in precise detail each and every example of behavior which indicates that the Company negotiated in bad faith. Tex Tan did not litigate in ignorance. It was fully apprised of each issue and can claim no surprise. A. H. Belo Corp. v. NLRB, 5 Cir. 1969, 411 F.2d 959; NLRB v. United Nuclear Corp., 10 Cir. 1967, 381 F.2d 972; Montgomery Ward & Co. v. NLRB, 8 Cir. 1967, 385 F.2d 760. Compare with Boyles Famous Corned Beef v. NLRB, 8 Cir. 1968, 400 F.2d 154.
 
 III.
 
 15
 Tex Tan next complains that the order entered by the Board forces it to put matters in the contract which have never been agreed upon and which are beyond the power of the Board to order. We find no merit in this complaint. The order relating to grievances requires that Tex Tan stop insisting on a provision which would deprive the employees of their right to file grievances regarding the establishment of piecework standards. Those parts of the order concerning the piecework production standards are closely related to the grievance procedures and the two will therefore be discussed together.
 
 
 16
 The Company's incentive system operates so that the employees receive wages based on the percentage of their actual production compared to a standard production norm assigned to each job. The standard, therefore, controls the amount of pay received. The Union was interested in a contract clause which would (1) assure that the standards were fairly set and (2) provide a basis for judging the fairness of the standard if a grievance should arise. The negotiations concerning these issues are typical of the Company's tactics during the bargaining conferences. Tex Tan managed to stifle all Union attempts to write a definition or guiding principle concerning the determination of the standards. For the most part this was accomplished by playing semantic games with the Union negotiator. During the early discussions the Company claimed the production standards and grievances on these standards were covered by the existing contract, but it refused to say what section of the contract applied. Tex Tan objected when the Union proposed to specifically include a definition and a grievance procedure in the contract. Finally Tex Tan submitted a proposal of its own concerning the definition of the standard. In this the Company restated the definition found in its employee booklet, but prefaced it with the suspicious language "without in any way limiting the Company's authority." When asked to explain this clause, the Company responded with the enlightening information that "it meant exactly what it said." The Union then suggested that the contract include language that the job standards would not be changed simply because of high earnings. The Company refused, saying this language would imply that this had been done in the past. The Union then offered to preface the suggested clause with the statement that "just as in the past" job standards would not be changed for reason of high earnings alone. At this point the Company replied that the Union was trying to wreck the system. The negotiations never progressed any further on this issue. The Board's order does no more than require the Company to bargain in good faith and cease its surreptitious semantic ploys and maneuverings which frustrated any hope of agreement on a contract definition which would be meaningful for purposes of determining whether a specific standard was fair.
 
 
 17
 Another part of the order takes care of the complementary problem and requires the Company to bargain in good faith about the grievance procedure. Since both wages and grievances are mandatory subjects of bargaining and the record as a whole indicates that Tex Tan's behavior was but a pretense at bargaining, the Board's order is reasonable. 29 U.S.C.A. § 158(d). Contrary to Tex Tan's assertions the order only requires that any agreement reached be incorporated into the contract. The Board did not attempt to dictate what the agreement might be. The order does, however, require the Company to include in the contract those things which are agreed upon in principle. In other words, linguistic obscurantism can no longer be used as a shield.
 
 
 18
 The Board also entered an order relating to timestudy information. This too is a part of the piecework standard controversy. The timestudies are an integral part of establishing the standard of productivity, and to check the fairness of any standard established the Union must have access to the Company timestudy data. Since we have held that the Union has a right to such information, Waycross Sportswear, Inc. v. NLRB, 5 Cir. 1968, 403 F.2d 832, the Board's order in this respect is clearly proper.
 
 
 19
 The remaining order objected to by Tex Tan concerns the vacation pay due the strikers. The old contract provided that vacation pay would be figured as a percentage of the employee's yearly salary, but that if any employee missed more than 280 hours of work in any year or was not employed on December 31 of any year, then all vacation pay would be forfeited. The Company chose to apply this policy to the strikers even though the contract had expired. The result was that all employees who remained on strike for the entire period were deprived of their vacation pay for both 1965 and 1966. The Trial Examiner and the Board held that since vacation pay was figured as a percentage of the amount earned, vacation benefits were already proportionately reduced for the time the workers were on strike and the further complete forfeiture of vacation benefits would unlawfully restrain and discriminate against the employees for engaging in their protected right to strike. The Trial Examiner based his decision on NLRB v. Great Dane Trailers Inc., 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, wherein the Supreme Court held that the denial of vacation benefits to strikers while paying such benefits to nonstrikers was discriminatory and a violation of § 8(a) (3) of the National Labor Relations Act. 29 U.S.C.A. § 158(a) (3). Tex Tan attempts to distinguish its position by asserting that it did not discriminate against strikers, claiming instead that the vacation policy was applied to strikers and non-strikers alike. While technically this may be true, the result of Tex Tan's policy was to deprive strikers of their vacation benefits. The strikers had a choice — lose their benefits or refrain from striking. We hold this is an unfair choice when (1) vacation benefits are a percentage of wages paid and thus have a built-in adjustment for any work time lost because of the strike, and (2) the strike is an unfair labor practice strike. The Court in Great Dane made it clear that there must be a valid business purpose for any action of the employer which has a discouraging effect on present or future concerted activities. The rule of Great Dane applies to coercion or restraint regardless of whether it is discriminatory under § 8(a) (3) or mere restraint under § 8(a) (1). The employer here has shown no valid business purpose for requiring a complete abrogation of vacation benefits in addition to the proportional reduction already built into the system. This, combined with the fact that unfair labor practice strikers are placed in an especially protected category, Mastro Plastics Corp. v. NLRB, 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; Majure v. NLRB, supra, is sufficient to justify the Board's order that Tex Tan pay vacation benefits to the strikers without regard to the number of days absent during the strike.
 
 
 20
 Moreover, Tex Tan's claim that there was no discrimination here is deceptive. It is true that on its face the vacation policy could be applied to all employees, strikers and non-strikers alike. Nevertheless, it is equally clear that the result in this case was that the strikers were injured because they exercised their right to strike. There was no way under Tex Tan's policy that an employee who remained on strike for the full term of the strike could receive vacation pay. Whatever the result might be if this had been an economic strike we need not here decide. We do hold that since this was an unfair labor practice strike the Company's vacation policy was both a restraint against the exercise of a protected activity under § 8(a) (1) and discriminatory under § 8(a) (3).
 
 IV.
 
 21
 Tex Tan's final complaint is that it was denied due process because of the bias and prejudice of the Trial Examiner. The Company's cry of foul merits scant attention. Far from showing prejudice the record indicates that the Trial Examiner showed remarkable restraint and patience during the outbursts and side bar comments which repeatedly marked the proceedings. Tex Tan's allegation of unfairness is like that of an athletic loser who in the agony of defeat swears that the umpire was blind or prejudiced. The record here demonstrates that this was not the case.
 
 
 22
 We have searched the record to ascertain if there be validity to Tex Tan's other contentions and find each without merit. The game was fairly won and the score must stand.
 
 
 23
 For the foregoing reasons the order of the Board is
 
 
 24
 Enforced.
 
 
 25
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 26
 Before BELL and GOLDBERG, Circuit Judges, and ATKINS, District Judge.
 
 PER CURIAM:
 
 27
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.